# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

NATHAN I. GAUSTAD,

        Plaintiff,

        v.                            Case No. 05-C-187

MATTHEW J. FRANK, GARY R. MCCAUGHTRY,
MARC CLEMENTS, STEVEN SCHUELER,
GARY ANKARLO, SARA COLEMAN,
and LETITIA LEY,

        Defendants.

## DECISION AND ORDER

Plaintiff Nathan I. Gaustad, a Wisconsin state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. He is proceeding on an Eighth Amendment claim based on the conditions of confinement in Waupun Correctional Institution's Health and Segregation Complex and an Eighth Amendment deliberate indifference to mental health claim. Before the court is the defendants' motion for summary judgment. The plaintiff's motion for extension of time and motion to amend/correct will also be addressed herein.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law - is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves. . ."); Fed. R. Civ. P. 56(e) ("When a summary judgment motion is made and supported as provided in [Rule 56(c),] an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavit or otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

2

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir. 1989). "However, we are not required to draw every conceivable inference from the record – only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (citation omitted).

## FACTS

The plaintiff is a Wisconsin state prisoner. He has been incarcerated at Waupun Correctional Institution (WCI) since April 23, 2003.

Defendant Gary McCaughtry ("McCaughtry") was employed by the Wisconsin Department of Corrections (DOC) as Warden of WCI from December 4, 1998 until his retirement in November 2004. In his capacity as Warden, McCaughtry had the duties and responsibilities as generally defined by sec. 302.04, Stats., and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code. McCaughtry's duties as Warden included general responsibility for the overall operation and administration of the institution, including the formation of institution policies applicable to inmates.

Defendant Marc Clements ("Clements") is employed by the DOC as Corrections Security Director at WCI. He has been employed in this position since July 16, 2000. In this capacity, Clements has the general responsibilities of administering and supervising the security program for the institution, planning

3

security program changes, directing the assignments of subordinate staff, and recommending security policy to the Deputy Warden and Warden.

Defendant Steve Schueler ("Schueler") is employed by the DOC as a Supervising Officer 2 at WCI. In this capacity, Schueler's duties include, but are not limited to, the supervision of all correctional officers, correctional sergeants, and supervising officer 1's on an assigned shift. He also has the responsibility for the overall direction and operation of an assigned shift. In addition, Schueler has the responsibility for the supervision and treatment of inmates.

Defendant Gary Ankarlo ("Ankarlo") is employed by the DOC as a Psychological Services Unit Supervisor at WCI. Under the general supervision of the Deputy Warden, this position is responsible for the overall administration of the Psychological Services Unit at WCI. Ankarlo is responsible for the development, administration, and coordination of all psychological programs within the unit, including supervision of the staff, provision of direct services, consultation, and support activities. In addition, Ankarlo provides psychological services to offenders, makes recommendations for institutional programming, assists in providing training to staff, and participates with other Psychological Services Unit staff in structured case conferences and staffing. Ankarlo received a Ph.D. from University of Wisconsin - Madison in 1998. He has been a Licensed Psychologist in the State of Wisconsin continuously since 2000.

Defendant Sara Coleman ("Coleman") was employed at WCI from

4

November 18, 2002, until June 26, 2005. During that time, Coleman held the position of Psychologist, Psychologist Senior Doctorate, and Psychologist – Licensed. Her position titles changed over time but the position duties remained the same. Coleman's duties included, but were not limited to, mental health screenings, conducting brief individual counseling and mental health monitoring, providing crisis intervention and prevention, individual psychotherapy, and psychological assessments to provide mental health services. Coleman received a Psy.D. in clinical psychology from the University of Hartford in West Hartford, CT. She has been a licensed psychologist in the State of Wisconsin continuously since March 18, 2004.

Letitia Ley ("Ley") was employed by the DOC on November 11, 2002 as a Staff Psychologist at WCI. On May 30, 2004 Ley became a Psychological Associate B. In that capacity, Ley's duties included, but were not limited to, clinical monitoring of general population inmates designated as MH1(receiving some mental health service from psychiatry or PSU but not designated as seriously mentally ill), MH2 (seriously mentally ill inmates, those with Axis I diagnoses of Schizophrenia, Delusional Disorder, Schizophreniform Disorder, Shcizoaffective Disorder, Psychotic Disorder NOS, Major Depressive Disorders, Bipolar Disorders –as well as inmates whose primary diagnoses are personality disorders and who are exhibiting significant functional impairment) and MH3 (mentally retarded). Additional job duties included limited provision of individual therapy, group therapy, crisis intervention, and limited

5

psychological testing to general population inmates. Ley received her Masters in counseling psychology from the University of Minnesota in June of 1997. Ley received her Ph.D. in Counseling Psychology through the University of Miami when she completed her doctoral dissertation in December of 2005.

The plaintiff received Conduct Report # 1621150 and on May 11, 2004, he was found guilty of violating rules 303.36, Misuse of State or Federal Property, and 303.26, Soliciting Staff, for trying to print legal documents while working on a class assignment. He was confined to WCI's Health and Segregation Complex (HSC) from May 11, 2004, until September 4, 2004. From September 4, 2004, until September 23, 2004, the plaintiff finished his segregation time in North Program which is housed in the North Cell Hall at WCI.

The HSC building at WCI can house 180 offenders. The HSC building is meant to house offenders from general population who have violated rules of the institution and have been placed in a segregated status.

HSC prisoners have the opportunity to go to shower two times per week, to go to recreation up to four hours weekly, and they can go out of their cells for medical appointments, visits, and legal recreation. Offenders also have contact with prison personnel on a daily basis as meal trays are handed out or as staff walk by cells to transport other offenders. Also, contact is made when the offenders shower, go to Health Service Unit appointments, go to recreation or to legal recreation, have attorney visits, or family or friends visits.

6

There is a concrete divider down the center of each wing in HSC. There are intermittent breaks in the concrete divider. The defendants aver that the divider is designed for the safety and security of staff and offenders. The plaintiff, on the other hand, avers that it serves no legitimate safety or security purpose.

The cell doors are made of steel with an observation window in them. The light fixture in each inmate cell in the HSC has a total of four florescent tubes. The 9-watt tube florescent nightlight is in the center of the light fixture and is illuminated at all times. The inmate controls four settings. The first position turns on a center 32-watt T8 florescent tube. The second position turns on two 32-watt T8 florescent tubes positioned on either side of the center tube. The third position turns on all three 32-watt tubes. The fourth position turns off all of the three 32-watt T8 florescent tubes but the nightlight remains on.

Since 1998, the nightlight has been a 9-watt, tube florescent light inside a fixture mounted high on the wall at the point where the wall and ceiling meet. For security and safety reasons, the nightlight is designed to be illuminated even in the event of a power outage by using WCI's self-contained power generation capacity. Illumination levels may vary slightly from cell to cell due to the age of bulbs and the different brands in use.

The defendants aver that for the safety of the inmates and staff as well the security of the institution, DOC officers need a clear view of the inmates. Officers need to be able to establish that there is a person actually in the cell and that all

7

activity in the cell is normal, that the inmate is alive and breathing. The officer needs to see the inmate to determine that the inmate is not sick, injured, or in need of medical assistance.

The plaintiff avers that the nightlight is bright enough to read small print by and interferes with sleep. He also avers that it serves no legitimate safety or security purpose since all correctional officers have flashlights which otherwise could be used to check on prisoners when making rounds, which is the method most commonly used in other maximum security segregation facilities.

According to the defendants, all cells offer natural sunlight as each cell has a frosted window through which sunlight passes. The plaintiff, on the other hand, maintains that no cell window in the HSC offers natural sunlight as each cell has a "fogged" window which obstructs sunlight as well as vision. The plaintiff avers that prisoners housed in these cells cannot tell where the sun is, and likewise, can only tell when it is daytime or nighttime.

Offenders can see the outdoors and natural sunlight in the recreation cages. There are six recreation cages which offer a social opportunity as well as a change of environment from their cells. The cages vary in size from approximately 8 feet x 8 feet to 8 feet x 10 feet. The cages are designed to separate inmates for the safety of other inmates. The cages have openings high up that are covered with wire and allow in natural light and air. The recreation cages offer an opportunity for the offender to engage in any self motivated exercise and to socialize with the other

8

offenders attending recreation. The use of recreation cages offers a change of scenery from their cells as well as climate conditions the same as if they were outside.

The offenders are not allowed outside of the HSC building although offenders that do have court appearances and off-site medical appointments are allowed to leave the building. HSC offenders are provided with video visits with family and friends and the visitations are done on closed circuit cameras. The visitation in HSC consists of the offender sitting in an HSC booth looking/hearing on a television monitor while the visitor is in a booth in the visit center looking/hearing on a television monitor.

Wisconsin Administrative Code § DOC 303.70 lists the items that inmates are entitled to possess while in segregation status. Consistent with the Administrative Code, the WCI Segregation Handbook lists the allowable personal property that an inmate may possess while in program segregation in the HSC. Inmates in Temporary Lock Up, Program Segregation, Disciplinary Separation, Protective Confinement and Administrative Confinement in HSC, specifically while on "Step 1" and "Step 2" statuses, may have the following property and/or items in their cell: one (1) pair state-issued socks, one (1) state-issued undershorts, one (1) state-issued T-shirt, one (1) pair state-issued segregation canvas shoes, one (1) set state-issued segregation uniform, one (1) state-issued washcloth, one (1) state-issued hand towel, two (2) state-issued bed sheets, two (2) state-issued blankets, one (1) state-

9

issued pillow, one (1) state-issued pillowcase, one (1) state-issued mattress, one (1) state-issued roll of toilet paper, one (1) state-issued bar of soap (in-cell use only), one (1) state-issued toothbrush, one (1) state-issued tube of toothpaste, one (1) state-issued comb or pick, one (1) approved wedding ring (must be married and ring must be worn on finger), one (1) pair prescription eyeglasses, denture or partial plate and container, legal materials (limit of two (2) shopping bags), first class mail (limit of 25 personal letters), one (1) Address book, one (1) box acetaminophen tablets 325 mg., one (1) box antacid tablets, one (1) box ibuprofen tablets 200 mg., one (1) tube of Vaseline, fifty (50) stamps, two (2) pads paper, one (1) pack carbon paper, one (1) box envelopes, five (5) legal size manila envelopes, one (1) file folder, one (1) expanding wallet folder, one (1) pocket dictionary, one (1) of either a Bible, Quran, Torah, Book of Shadows, or equivalent religious book, one (1) pair shower thongs, one (1) television ("PC," "ADM," Step 3; C-Wing only), one (1) radio or existing radio/cassette combo ("PC," "ADM," Step 3; C-Wing only), one (1) earplugs* ("PC," "ADM," Step 3; C-Wing only), one (1) headset ("PC," "ADM," Step 3; C-Wing only), cable & transformer for electronics ("PC," "ADM," Step 3; C-Wing only), Segregation Unit inmates will be issued the insert of a pen only.

Every Sunday during second shift at WCI, free library books are made available to inmates in segregation. Inmates in Steps 1, 2, 3 of segregated status may receive two books at a time. The books are handed out on an exchange basis only. By definition, the books made available to inmates in segregated status during

this Sunday distribution are limited to the books maintained by the WCI library.

Although McCaughtry did have general supervisory authority over WCI operations as provided in the Wisconsin Statutes, he did not supervise the day-to-day medical and psychological decisions of the Health Services Unit and Psychological Services Unit personnel at the various departments within WCI. McCaughtry, Clements and Schueler do not and are not qualified to provide medical services to inmates at WCI. Such diagnostic and treatment services are provided to inmates by the WCI Health Services Unit and Psychological Services Unit. They exercise no control over or input into Health Services Unit and Psychological Services Unit staff diagnostic and treatment decisions. They exercise no day to day control over Health Services Unit and Psychological Services Unit decisions in calendaring appointments or prescribing medication for inmates with medical staff. McCaughtry, Clements, and Schueler had no personal involvement with the medical or psychological care given to the plaintiff. At no time did McCaughtry, Clements, and Schueler believe that placing or keeping the plaintiff in the HSC posed a substantial risk of serious harm to his health or safety.

As Security Director, defendant Clements would have reviewed DOC-30 monthly reports which contain issues related to psychological services, health services, and security for inmates who are housed in the HSC. As Warden, defendant McCaughtry would also have reviewed the DOC-30 monthly reports. As Program Captain, defendant Schueler conducts investigations and is a member of

11

the Special Review Team that reviews each inmate housed in the HSC every 30 days.

At the present time there is no HSC mental illness screening tool that the DOC uses. A mental illness screening is not required to place an inmate in segregation status in any DOC institution except for the Wisconsin Secure Protection Facility.

Inmates who violate the rules of the DOC 303 and might otherwise engage in activities that threaten the safety and security of the institution are placed in the HSC. Security staff is responsible for the placement of inmates in HSC and the release of inmates from HSC. Upon an inmate's transfer to the HSC, defendant Ankarlo will review the WCI internal Psychological Services Unit database. If at that time it is determined that they have mental health needs Ankarlo will refer them to a HSC clinician.

When the plaintiff arrived in the HSC unit on May 11, 2004, defendant Letitia Ley was notified of his arrival and the plaintiff was seen that day for evaluation. The Psychological Services Unit has no authority over the placement of inmates in HSC or the removal of inmates from HSC. WCI employs two full time licensed staff psychologists, one full time psychological associate, one full time crisis intervention worker, and one half time psychological associate. Inmates on clinical are seen every one to six months depending on their symptoms, needs, and degree of mental illness. Every inmate has different needs, so one inmate might see psychological services more than another.

The plaintiff was confined to the HSC from May 11, 2004, until September 4, 2004. Defendant Ankarlo avers that at all times, WCI staff responded appropriately to the plaintiff's threats of self-harm by placing him in observation status. Based upon Ankarlo's professional judgment and expertise, and to a reasonable degree of medical certainty, the plaintiff was provided with appropriate treatment. At all times during his incarceration at WCI, Ankarlo addressed the plaintiff's needs based upon his knowledge, experience, and expertise as a licensed psychologist.

Although inmates in HSC are customarily followed solely by the HSC Psychological Services Unit clinicians, defendant Ley met with the plaintiff upon his request on May 11, 2004, in the HSC building. He initially presented with mildly dysphoric mood, affect consistent with mood and intermittent tearfulness and reported to the clinician that he was unsure regarding his ability to cope adaptively with segregation time. He deflected any responsibility for his placement in segregation from himself and instead blamed the teacher who had written him the conduct report. After approximately 20 minutes of supportive listening, cognitive-behavioral intervention and psychoeducation, the plaintiff exhibited affective brightening and endorsed a belief that he would be able to cope with time in segregation. In addition to his monitoring by the regular HSC Psychological Services Unit clinicians, Ley agreed to meet with the plaintiff in HSC to provide bibliotherapy and cognitive-behavioral intervention.

Defendant Ley met with the plaintiff on a bi-weekly to weekly basis while he

13

was in the HSC. Ley provided supportive listening, cognitive-behavioral intervention, psychoeducation, crisis intervention, and bibliotherapy. The goals of the offered interventions were to facilitate his management of situational symptoms of dysphoric mood and agitation and to increase the plaintiff's repertoire of adaptive coping and self-soothing mechanisms so that he could realize increased self-esteem, tolerate segregation time, and could generalize these new skills to other, future challenging life situations.

On May 14, 2004, the plaintiff reported feelings of sadness/hopelessness and then requested segregation transfer to Columbia Correctional Institution to address this symptom. On this date the plaintiff denied suicidal ideation, planning and intent and contracted to maintain his own safety. The plaintiff avers that defendant Ley told him to "tough it out." (Pl.'s Dec. in Opp'n to Mot. for Summ. J. ¶ 30.) Defendant Ley denies telling the plaintiff to "tough it out." (Ley Aff. ¶ 15.)

Defendant Ley again met with the plaintiff on May 18, 2004. The plaintiff reported having thoughts about using a sheet to harm himself, but denied any intent to do so. Ley reviewed adaptive coping strategies with the plaintiff, who continued to contract to maintain his own safety. Suicide risk assessment indicated that immediate (that day) observation placement was not necessary. Ley again indicated a plan to follow on accelerated monitoring schedule.

The plaintiff was placed on clinical observation on May 23, 2004. On May 23, 2004, when the plaintiff had been informed that he missed his shower, while in full

14

view of staff he attempted to tie a sheet around his neck and to secure the other end to some room fixture but was unable to do so. Security staff placed him in observation and reported to Ley that he was not in any real danger of inflicting self-harm prior to observation placement due to the following: 1) inability to secure sheet to anything, and 2) having made this gesture in front of staff, who immediately intervened.

Defendant Ley met with the plaintiff twice on May 24, 2004, while in observation status. The plaintiff was retained in observation to allow additional time to evaluate the self-harm risk level despite his statements that he was immediately ready to return to his cell because observation was "cold and boring." Ley also placed the plaintiff on a "sharps restriction" and food monitor to provide further staff monitoring and further protect the plaintiff, as he indicated that he would starve or cut himself if he were not immediately transferred out of WCI. It was notable that the self-harm gesture was linked by the plaintiff to his demand for secondary gain of transfer out of WCI, and it was notable also that he presented as future oriented in his complaints regarding temperature and lack of entertainment.

Ley again interviewed the plaintiff on May 25, 2004. She again reviewed adaptive coping mechanisms with the plaintiff as well as stress management interventions, which he agreed to practice. He denied suicidal ideation, planning, and intent and again contracted to maintain his own safety. He presented as future-oriented with euthymic mood and without psychomotor or speech

15

agitation/retardation. He was released from observation in the late afternoon of May 25, 2004.

Defendant Coleman saw the plaintiff on May 25, 2004, to review his observation placement. The plaintiff presented as oriented and with appropriate affect, including euthymic affect. His thought processes were logical and goal-directed and he did not appear distracted by internal stimuli. He denied continuing suicidal ideation or thoughts of self harm. He also denied a history of true suicide attempts, though admitted to engaging in self harm in the past. Coleman decided to release the plaintiff from observation because he no longer presented an immediate danger to himself. He agreed to contact staff if he again experienced suicidal thoughts, plans or intent. Coleman and the plaintiff discussed healthier means by which the plaintiff could cope with stressful times. The plaintiff agreed to utilize these skills in the future.

Defendant Ley next saw the plaintiff on June 3, 2004. The plaintiff did not report suicidal ideation, planning, or intent. He stated that he would refuse further contact with Ley and stated that he would only accept monitoring by the HSC clinician, CIW G. Kaemmerer.

Defendant Coleman met with the plaintiff on June 7, 2004. He was cooperative and appropriate throughout the session. He expressed frustration about a recent ticket he received and with his overall dislike of his current surroundings and situation. They discussed treatment opportunities. His main request was to be

16

moved from WCI to another institution. Coleman told him that such a transfer was not being considered at that time. The only recommendation she could make for transfer out of the institution was to a mental health facility such as Wisconsin Resource Center. Coleman found that his problems seemed situational based and not suggestive of a major mental illness so the Wisconsin Resource Center was not deemed necessary or appropriate for him at that time. The plaintiff reported thoughts of self-harm but that he had no plan or intent to act on those thoughts. He reported that he was stable and "doing okay" before he received notice regarding a conduct report. Coleman encouraged the plaintiff to contact the Psychological Services Unit if he needed psychological assistance prior to when he was next seen.

Defendant Coleman met with the plaintiff again on June 8, 2004. He had been found to have 40 feet of string and was given a new conduct report and placed in control status. Coleman met with the plaintiff following this placement. He was very tearful throughout the interview, stating that he "can't do seg" and that he "can't handle this." He stated that he wanted to die but that he didn't want to hurt himself. His thought pattern was very negative and he presented as unstable throughout the interview. He did participate in the interview and evidenced clear, goal-directed thoughts. His affect was dysthymic and he presented as helpless. He was disturbed with the removal of his pens and paper in accordance with his control status. He was unable to identify any means by which to cope with this situation. Coleman approved an observation placement for the plaintiff. While in observation, the

17

plaintiff was monitored by Psychological Services Unit staff. (Coleman Aff. at ¶ 11, p. 3)

Coleman next saw the plaintiff on July 21, 2004, at which time he displayed a somewhat flat, angry affect. His thought process was logical and goal-directed. His concentration, attention, memory, and psychomotor abilities were intact. The plaintiff reported that his primary reason for asking to be seen was to inquire about his sharps restrictions. Coleman agreed to review his case, meet with him on August 3, and make a recommendation to security at that time. He agreed to participate in the process. Coleman encouraged the plaintiff to contact her or the Psychological Services Unit if he needed psychological assistance prior to when he was next seen.

Defendant Coleman met with the plaintiff on August 3, 2004, in order to review his sharps restriction. He presented with flat affect. His thought processes were logical and goal-directed and he was oriented x 4. The plaintiff reported his sleep was stable and his self-report supported this summary. He described an appetite that was within normal limits. He described his mood as depressed and that he was taking his psychiatric medications as prescribed. The plaintiff denied any thoughts of homicidal, suicidal, or self-harm behavior. He commented that he was "deteriorating," though his self-reported current status did not support this summary. Based on his presentation, recent status, and self-report, the plaintiff's sharps restriction was deemed clinically appropriate for removal. This recommendation was

made to the HSC security captain.

Defendant Matthew J. Frank ("Frank") is employed by the State of Wisconsin as the Secretary of the DOC. He has held this position since January 6, 2003. In his capacity as the Secretary of DOC, Frank has the responsibilities as generally defined by sec.15.04, Wis. Stats., and as otherwise specifically set forth in the Wisconsin Statutes and Wisconsin Administrative Code. Although Frank has the general supervisory authority over DOC operations as provided in the Wisconsin Statutes, he does not supervise the day-to-day operations of individual DOC institutions or employees. Frank does not and is not qualified to provided medical or clinical services to inmates at the WCI. Such diagnostic and treatment services are provided to inmates by the WCI Health Services Unit or Psychological Services Unit, and agency of DOC's Bureau of Correctional Health Services. Frank exercises no day to day supervisory control over Health Services Unit or Psychological Services Unit employees; nor does he have any control over or input on their diagnostic and treatment decisions. Frank exercises no day to day control over Health Services Unit or Psychological Services Unit decisions with medical staff in calendaring appointments or prescribing medications for inmates. Frank had no knowledge of, nor was he ever personally involved in, any decisions concerning any treatment plans, programs, or any other decisions related to the plaintiff. Frank has had no personal involvement with the mental health care given to the plaintiff. Frank has no role in implementing mental health screening tools for the evaluation of

19

prisoners confined within HSC and other similar extended control facilities. Frank has no formal training or experience in this field; therefore, he relies upon staff educated and trained in this area to provide those services. Frank has had no personal involvement in the allegations indicated in the complaint in this action.

## ANALYSIS

The defendants contend that, 1) defendant Frank should be dismissed for lack of personal involvement; 2) the plaintiff's Eighth Amendment rights were not violated by his conditions of confinement in the HSC; and 3) they are entitled to qualified immunity. The plaintiff contends that, 1) there are material issues of fact precluding summary judgment; 2) his Eighth Amendment rights were violated because conditions within the HSC posed a substantial risk of serious harm and the defendants were aware of the risk of psychological harm posed by the conditions; and 3) the defendants are not protected by qualified immunity.

The Eighth Amendment proscribes cruel and unusual punishment in cases of official conduct which is not part of the formal penalty for a crime if a plaintiff demonstrates: (1) a "sufficiently serious" deprivation and, (2) that officials acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 299 (1991). To prevail on his Eighth Amendment claim, the plaintiff must show that he was subjected to conditions which denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Prison conditions cannot rise to the level of cruel and unusual punishment unless the conditions

20

produce "the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304. The plaintiff must also show that the defendants acted with a culpable state of mind:

> [A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measure to abate it.

*Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

In addition, deliberate indifference to the serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, and thus is proscribed by the Eighth Amendment. *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)). To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. at 834; *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle*, 429 U.S. at 104-05; *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000). To defeat the defendants' motion for summary judgment, the plaintiff must cite evidence from which it can be inferred that he had a serious mental health need and that prison officials were deliberately indifferent to this need. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).

It is undisputed that the plaintiff was confined to the HSC from May 11, 2004 until September 4, 2004, as the result of being found guilty on Conduct Report

# 1621150. During that time, the plaintiff was confined to his cell at all times except for twice weekly showers, up to four hours of recreation per week, and being placed on observation status twice. There is one constantly illuminated 9-watt florescent light in HSC cells. Other in-cell lights are controlled by inmates. In addition, each cell has a fogged/frosted window through which inmates can tell whether it is daytime or nighttime.

HSC inmates have limited contact with other people. The HSC building is meant to house offenders from general population who have violated rules of the institution and have been placed in segregated status. However, HSC inmates have contact with prison personnel on a daily basis as meal trays are handed out. Contact is also made when the offenders shower, go to Health Services Unit appointments, go to recreation, and have visits from attorneys or family and friends.

In addition to the contact mentioned above, it is undisputed that the plaintiff had the following mental health related contact with defendants Ley or Coleman while he was in the HSC:

1) May 11, 2004, defendant Ley met with the plaintiff;

2) May 14, 2004, defendant Ley met with the plaintiff;

3) May 18, 2004, defendant Ley met with the plaintiff;

4) May 24, 2004, defendant Ley met with the plaintiff in observation status;

5) May 25, 2004, defendant Ley met with the plaintiff;

22

6) May 25, 2004, defendant Coleman met with the plaintiff to review his observation placement;

7) June 3, 2004, defendant Ley met with the plaintiff, and the plaintiff stated that he would refuse further contact with Ley;

8) June 7, 2004; defendant Coleman met with the plaintiff;

9) June 8, 2004, defendant Coleman met with the plaintiff in control status and approved an observation placement for the plaintiff - while in observation, the plaintiff was monitored by PSU staff;

10) July 21, 2004, defendant Coleman met with the plaintiff; and

11) August 3, 2004, defendant Coleman met with the plaintiff.

Determining whether the plaintiff's constitutional rights have been violated requires a "fact-intensive inquiry under constitutional standards." *Gillis v. Litscher*, 468 F.3d 488, 492-93 (7th Cir. 2006) (quoting *Chandler v. Baird*, 926 F.2d 1057, 1064 (11th Cir. 1991)). In *Chandler*, a case which the Seventh Circuit Court of Appeals has cited with approval,

> the inmate was confined in a cell with no clothing except undershorts and with a plastic-covered mattress without bedding. The temperature in the cell was alleged to be as low as 60 degrees. The inmate contended that he sometimes slept huddled with a roommate, sleeping between two mattresses. The prison officials disagreed, saying that the cell was controlled by the same thermostat that controlled areas of the prison occupied by nurses and no one else complained about the temperature. They acknowledged, however, that the other people in these areas were fully clothed. The inmate also received no toilet paper for 3 days. The *Chandler* court vacated a grant of summary judgment for the prison officials and sent the case back to the district court for trial.

*Gillis*, 468 F.3d at 493. *See also Lewis v. Lane*, 816 F.2d 1165 (7th Cir. 1987) (an

23

allegation of inadequate heating may state an Eighth Amendment violation); *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) ("[A] state must provide ... reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (*i.e.*, hot and cold water, light, heat, plumbing)."); *Maxwell v. Mason*, 668 F.2d 361, 365 (8th Cir. 1981) (confinement in isolation without adequate clothing or bedding supports an Eighth Amendment claim: "clothing is a 'basic necessity of human existence'").

The plaintiff spent less than four months in segregation status in the HSC. The conditions there, though not comfortable, have not been shown to produce the deprivation of a single, identifiable human need. The relatively short amount of time that the plaintiff spent in the HSC, together with conditions that do not rise to the level of severity that other courts have found may violate an inmate's rights, lead to the conclusion that the conditions in the HSC do not implicate the Eighth Amendment. Thus, there is no need to determine whether the defendants acted with a sufficiently culpable state of mind. Accordingly, the defendants' motion for summary judgment on the plaintiff's conditions of confinement will be granted.

Turning to the deliberate indifference to mental health claim, the first question is whether the plaintiff had a serious medical need. WCI records indicate that on May 11, 2004, the plaintiff's mental health classification was "MH-2," or serious mental illness. (Coleman Aff. ¶ 5, Ex. A at 1.) At that time, his Axis I Diagnosis was "Major Depressive Disorder, Recurrent" and his Axis II Diagnosis was "Antisocial Personality Disorder." *Id.* On June 3, 2004, the plaintiff's mental health

24

classification was changed to "MH-1," or mental health need, no serious mental illness. (Coleman Aff. ¶ 5, Ex. A at 8.) His Axis I Diagnosis was "No diagnosis" and his Axis II Diagnosis was "Antisocial Personality Disorder." *Id.* In addition, DOC records indicate that on February 11, 2002, the plaintiff was screened for a mental illness and pursuant to that screening, it was determined that he should not be transferred to the Wisconsin Secure Program Facility, formerly known as "Supermax." (Pl.'s Dec. ¶ 34, Ex. E.)

For the purposes of deciding the defendants' motion for summary judgment, the court assumes that the plaintiff's mental health issues qualify as a serious mental need. *See also Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003); *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001) (it is well-settled that suicide is an objectively serious harm).

The next question is whether by placing the plaintiff in the HSC, the defendants were deliberately indifferent to the plaintiff's serious medical need. In that regard, the court is mindful that, in most cases, managing prisons is not a job for the federal courts:

> "Federal judges must always be circumspect in imposing their ideas about civilized and effective prison administration on state prison officials. The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about the management of prisons; managerial judgments generally are the province of other branches of government than the judicial; and it is unseemly for federal courts to tell a state ... how to run its prison system."

25

*Scarver v. Litscher*, 434 F.3d 972, 976-77 (7th Cir. 2006) (officials at the Wisconsin Secure Program Facility did not unconstitutionally subject homicidal schizophrenic inmate to cruel and unusual punishment, absent evidence that they knew conditions of confinement, i.e., heat, constant illumination, and lack of sound, were making his mental illness worse) (quoting *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir. 1985)).

It is undisputed that inmates who violate the rules of the DOC 303 and might otherwise engage in activities that threaten the safety and security of the institution are placed in the HSC. The DOC does not use a mental illness screening tool with regard to placement in the HSC. A mental illness screening is not required to place an inmate in segregation status in any DOC institution except for the Wisconsin Secure Program Facility. However, upon an inmate's transfer to the HSC, if it is determined that the inmate has mental health needs, defendant Ankarlo will refer them to a HSC clinician.

It is undisputed that while he was in the HSC, the plaintiff was seen by defendant Ley six times, after which time the plaintiff refused to see Ley anymore. The plaintiff was seen by defendant Coleman five times while he was in the HSC. The plaintiff was also monitored by Psychological Services Unit staff. In fact, based on DOC clinical evaluations, the plaintiff's mental health condition improved while he was in the HSC in that his status was changed from MH-2 to MH-1. The record does not support a finding that any defendant acted with deliberate indifference to the plaintiff's serious medical needs. Rather, the undisputed facts show that the plaintiff

26

was provided with ongoing psychological assistance while he was in the HSC.

Based on the foregoing, the defendants' motion for summary judgment will be granted.

## PLAINTIFF'S MOTION TO AMEND/CORRECT

The plaintiff has filed a motion to revise the May 13, 2005, Order dismissing his claims of due process violations. The court has already addressed a motion for reconsideration of the May 13, 2005 Screening Order, *see* Court's Order of October 21, 2005, and it declines to do so again.

## PLAINTIFF'S MOTION FOR EXTENSION OF TIME

On November 17, 2006, the plaintiff filed his sixth motion for extension of time to respond to the defendants' motion for summary judgment. The plaintiff filed his response on December 1, 2006, and the court considered the response in resolving the summary judgment motion. His motion for extension of time will be denied as moot.

## ORDER

**IT IS ORDERED** that the defendants' motion for summary judgment (Docket #64) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for extension of time (Docket #87) be and the same is hereby **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that the plaintiff's motion to amend/correction (Docket #99) be and the same is hereby **DENIED**; and

27

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on the merits.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this ⎯15th⎯ day of February, 2007.

BY THE COURT:

⎯s/ J. P. Stadtmueller⎯⎯⎯⎯⎯⎯
J. P. Stadtmueller
U.S. District Judge

28